# IN THE SUPREME COURT OF TEXAS

No. 19-0282

WASTE MANAGEMENT OF TEXAS, INC. AND RIGOBERTO ZELAYA, PETITIONERS,

v.

ROBERT STEVENSON, RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS

**Argued October 28, 2020**

JUSTICE BLACKLOCK delivered the opinion of the Court, in which CHIEF JUSTICE HECHT, JUSTICE GUZMAN, JUSTICE LEHRMANN, JUSTICE DEVINE, JUSTICE BUSBY, JUSTICE BLAND, and JUSTICE HUDDLE joined.

JUSTICE BOYD filed a concurring opinion.

An employee of a temporary staffing agency was injured while on assignment to a client of the agency. He recovered workers compensation benefits through the staffing agency and then sued the client for whom he performed the work. The Court must decide whether the injured worker can proceed with a tort claim against the client defendant, who argues that the plaintiff qualifies as its employee under the Workers' Compensation Act. If the plaintiff is the defendant's employee, then the Act's exclusive-remedy provision bars the plaintiff's claims. Because we conclude that the plaintiff qualifies as the defendant's employee under the Workers' Compensation Act, we reverse the court of appeals' judgment and render judgment for the defendant.

## I. Background

Robert Stevenson was hired by Taylor Smith Consulting, LLC, a temporary labor supplier. Taylor Smith assigned Stevenson to work on a temporary basis for Waste Management of Texas, Inc. ("Waste Management" or "Waste Management Texas"). Waste Management operates garbage trucks, and Stevenson worked on one of those trucks.

The assignment of Stevenson to Waste Management Texas was subject to the "Master Agreement," a contract between Taylor Smith and Waste Management National Services, Inc. Although Waste Management Texas is not a party to the Master Agreement, Taylor Smith has assigned hundreds of workers to Waste Management Texas under the Master Agreement. The parties agree that Waste Management Texas and Waste Management National Services are affiliated corporations, though the briefing and record never precisely explain the legal relationship between the two.

In May 2014, Stevenson was working on a Waste Management garbage truck. The truck was on one of its usual garbage-collection routes. Rigoberto Zelaya, a Waste Management employee, drove the truck. Zelaya accidentally backed the truck over Stevenson's leg and foot, seriously injuring Stevenson.

Both Waste Management and Taylor Smith carried workers compensation insurance for their employees. Stevenson applied for benefits under Taylor Smith's workers compensation policy. He also sued Waste Management and Zelaya, alleging common-law negligence. The

2

defendants[1] moved for summary judgment, arguing that the exclusive-remedy provision of the Workers' Compensation Act barred Stevenson's claims. The defendants argued that Stevenson was, for workers compensation purposes, Waste Management's employee at the time of the accident. Stevenson argued in a cross-motion for summary judgment that no evidence existed that he was Waste Management's employee. Stevenson relied primarily on the Master Agreement, which states that temporary laborers like Stevenson "shall be independent contractors in respect of Waste Management." The trial court granted summary judgment for Waste Management.

The court of appeals reversed and remanded, holding that a genuine fact issue existed on whether Stevenson was Waste Management's employee. *Stevenson v. Waste Mgmt. of Tex., Inc.*, 572 S.W.3d 707, 715 (Tex. App.—Houston [14th Dist.] 2019).

## II. Analysis

### A. Employer-Employee Status Under the Workers' Compensation Act

"Recovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance coverage . . . against the employer or an agent or employee of the employer for the death of or a work-related injury sustained by the employee." TEX. LAB. CODE § 408.001(a). There is no dispute that Waste Management had workers compensation insurance coverage for its employees. Stevenson's claims against Waste Management and Zelaya are therefore barred if Stevenson was "an employee covered by [Waste

---

[1] For convenience, we may refer collectively to the defendants as Waste Management or Waste Management Texas.

3

Management's] workers' compensation insurance coverage." The dispositive question in this case is whether, for workers compensation purposes, Stevenson was Waste Management's employee.

The Workers' Compensation Act defines "employee" as "each person in the service of another under a contract of hire, whether express or implied, or oral or written." *Id.* § 401.012(a). An "employer" is "a person who makes a contract of hire, employs one or more employees, and has workers' compensation insurance coverage." *Id.* § 401.011(18).[2] Although determining whether a plaintiff is the defendant's employee is ultimately a matter of applying these statutory definitions, courts have not often found the definitions alone to be dispositive. Frequent litigation over the exclusive-remedy provision has yielded a large body of case law, including several decisions of this Court, addressing whether the plaintiff was the defendant's employee for workers compensation purposes. Under those cases, "[t]he test to determine whether a worker is an employee rather than an independent contractor is whether the employer has the right to control the progress, details, and methods of operations of the work." *Limestone Prods. Distrib., Inc. v. McNamara*, 71 S.W.3d 308, 312 (Tex. 2002) (per curiam). The parties agree that this "right-to-control" test arises from this Court's decisions, but they disagree about what "right to control" means and whether Waste Management had it.

Several previous decisions of this Court under similar facts help to answer those questions. All involved plaintiff workers provided by employment agencies to the client defendant. In

---

[2] "An employee may have more than one employer within the meaning of the TWCA, and each employer may raise the exclusive remedy provision as a bar to the employee's claims." *W. Steel Co. v. Altenburg*, 206 S.W.3d 121, 123 (Tex. 2006) (per curiam). The undisputed fact that Stevenson was Taylor Smith's employee does not dictate whether Stevenson was also Waste Management's employee. *See*, *e.g.*, *Garza v. Excel Logistics, Inc.*, 161 S.W.3d 473, 475 (Tex. 2005); *Wingfoot Enters. v. Alvarado*, 111 S.W.3d 134, 140 (Tex. 2003).

4

*Wingfoot Enterprises v. Alvarado*, 111 S.W.3d 134 (Tex. 2003), the plaintiff Alvarado was hired by Wingfoot Enterprises, a temporary staffing agency. Alvarado was assigned to work at a manufacturing facility owned by Web Assembly, Inc., where he was injured. Alvarado sued Wingfoot, alleging negligence and gross negligence under several theories. Wingfoot argued that it was Alvarado's employer and that the exclusive-remedy provision of the Workers' Compensation Act barred the claims. We agreed with Wingfoot and held that "[a]n employee injured while working under the direct supervision of a client company is conducting the business of both the [employment agency] and that employer's client." *Id.* at 143.

In *Garza v. Exel Logistics, Inc.*, 161 S.W.3d 473 (Tex. 2005), the plaintiff Garza was hired by an employment agency and assigned to work at Exel's premises. Garza was injured on the job while following the instructions of an Exel employee. *Id.* at 477. He sued both the employment agency and its client, Exel. We stated that "in determining if a general employee of a temporary employment agency is also an employee of a client company for purposes of the Act, we consider traditional indicia, such as the exercise of actual control over the details of the work that gave rise to the injury." *Id.* at 477. We held that Exel was Garza's employer because the "undisputed evidence establishes that at the time Garza was injured, he was working on Exel's premises, in the furtherance of Exel's day-to-day business, and the details of his work that caused his injury were specifically directed by Exel." *Id.*

Finally, in *City of Bellaire v. Johnson*, 400 S.W.3d 922 (Tex. 2013) (per curiam), we revisited the issue under facts nearly identical to those before us today. Magnum Staffing employed plaintiff Johnson and provided him to the City of Bellaire as a garbage collector.

5

Johnson was injured working on a truck driven by a City employee. Both Magnum and the City had workers compensation coverage. Johnson sued the City, which asserted the exclusive-remedy provision of the Workers' Compensation Act. This Court applied the standard articulated in *Limestone Products*, under which a worker is an employee rather than an independent contractor if the employer "has the right to control the progress, details, and methods of operations of the work." *Id.* at 923–24 (quoting *Limestone Prods.*, 71 S.W.3d at 312). The overwhelming evidence indicated that "[t]he City set Johnson's work schedule, gave him his assignments, and supervised his work." *Id.* at 923. We concluded that "undisputed evidence does establish as a matter of law that the City controlled the details of Johnson's work and thus, that Johnson was its employee." *Id.*[3]

In each of these dual-employment cases, the fact that the defendant did not directly employ the worker provided by the staffing agency did not factor prominently in the analysis. Nor did the result turn on the contractual relationship between the staffing agency and its client. Instead, we determined whether the defendant qualified as the worker's employer under the Act by examining

---

[3] In *Garza*, we noted that the worker was injured on the client employer's premises. 161 S.W.3d at 477. The court of appeals distinguished *Garza* because "Stevenson was not working on Waste Management's premises" but was instead working on a garbage-collection route. *Stevenson*, 572 S.W.3d at 711. However, in *City of Bellaire*, we found the injured temporary worker was an employee of the client under precisely these circumstances, where the accident occurred on the client's garbage truck route. As in *City of Bellaire*, whether Stevenson's accident occurred on property owned by Waste Management is not a relevant consideration. The Act itself reinforces this point by defining "course and scope of employment" to cover activities "conducted on the premises of the employer *or at other locations*." TEX. LAB. CODE § 401.011(12) (emphasis added); *see also id.* § 406.031(a) & (a)(2) ("An insurance carrier is liable for compensation for an employee's injury without regard to fault or negligence if . . . the injury arises out of and in the course and scope of employment."). Thus, Stevenson may qualify as an employee of Waste Management even if his injury did not occur on Waste Management's premises. Stevenson does not argue otherwise, conceding in his brief that the "issue about location of the injury is not presented here because Stevenson was hurt while working on the 'normal route' picking up garbage around Mason Road and Highway 290, in the Fairfield subdivision near Houston."

the parties' conduct at the jobsite. Rather than focus on the legal question of who had the contractual right to control the plaintiff's work, we looked instead to the factual question of who exercised the right to control as a practical matter in the course of the parties' daily work.

The approach reflected in our prior dual-employment cases is consistent with the statutory definition of "employee" provided by the Workers' Compensation Act. An "employee" is "each person in the service of another under a contract of hire, whether express or implied, or oral or written." TEX. LAB. CODE § 401.012(a). The definition expressly includes workers operating under a written contract, so long as they are "in the service of" the employer. As our prior cases indicate, whether a plaintiff employed by a staffing agency was "in the service of" the agency's client has always depended on the extent to which the parties' conduct at the jobsite demonstrated the client's right to control the plaintiff's daily work.

Applying the same approach to the facts of this case, there is no doubt Waste Management controlled Stevenson's work, both as a general matter and in the specific circumstances of his accident. The summary judgment evidence shows the following. Stevenson was injured while on assignment to Waste Management. He was working on a garbage truck owned by Waste Management and on a garbage hauling route operated by Waste Management. In his deposition, Stevenson agreed that Waste Management route managers had "the ability to tell you what to do and how to do your job." He also agreed that the garbage truck driver, a Waste Management employee, was "the captain of the ship" and "the guy in charge." He agreed that the driver had the authority to tell him that he was doing his job incorrectly and that "[y]ou need to do it this way." The driver was "in charge of the work that was done." The driver would decide where the

7

helper would stand on the truck and when they would break for lunch. The driver even had authority to decide which side of the street the helper could use.

The driver, Zelaya, testified that, on the day of the accident, "I was controlling [Stevenson] with respect to how to do the job." He testified that in the morning he would instruct the helpers as to "what we're going to do and how we're going to do it." He gave instructions to the helpers at the beginning of the route. Zelaya had "the right to control how the helpers did their work on the day of the accident."

Waste Management's operations manager testified that Stevenson, while assigned to Waste Management, was a Waste Management employee and was under the control of Zelaya, the driver. Zelaya was the "captain" of the truck and was in "full control" of the helpers. He was continuously in control of the crew beginning in the morning. Waste Management provided helpers with instructions and training. Waste Management had the authority to assign tasks and to tell the helper to stop unauthorized conduct.

The owner of Taylor Smith testified that Taylor Smith did not control Stevenson's work and that Stevenson was not an independent contractor but instead worked for Waste Management. He stated that once Taylor Smith sent workers to Waste Management, Waste Management supervised the workers, controlled their work, and told them what to do. "Once we put the person on the assignment at the site we—we don't manage them at that point. We don't tell them what to do. We don't give them directives." Once workers are assigned, they are "managed and fired and all those things by the client." Waste Management had "the right to control the details of the work for helpers who are out on a route." Once assigned to Waste Management the worker is

trained, managed, and disciplined by the client, and Waste Management decided Stevenson's hours.

All these facts regarding the daily relationship between Waste Management and Stevenson at the workplace indicate that Stevenson was Waste Management's employee under the Act. In response, Stevenson points to evidence that Waste Management did not directly, physically control his every movement. For example, Zelaya testified that, as the driver, he could not control Stevenson because "he's on the side of the street," and that Stevenson "is a grown-up man" who knew "what he was doing." Zelaya further testified that Stevenson knew "what to do" and "how to do it." But employer status does not depend on whether the employer physically controls every action of the employee. Every employee is to some extent self-directed in the physical carrying out of his daily work. This limited sphere of personal autonomy does not mean that the worker has no employer under the Workers' Compensation Act.

The foregoing evidence conclusively established that Waste Management controlled the "progress, details, and methods of operations of the work." *Limestone Prods.*, 71 S.W.3d at 312. Waste Management "set [Stevenson's] work schedule, gave him his assignments, and supervised his work." *City of Bellaire*, 400 S.W.3d at 923. Moreover, at the time of the accident, Waste Management exercised "actual control over the details of the work that gave rise to the injury." *Garza*, 161 S.W.3d at 477. There is no evidence that Taylor Smith or Stevenson exercised any control over the details of Stevenson's work, either as a general matter or at the time of his injury. Just as in *City of Bellaire*, the evidence "establish[es] as a matter of law that [Waste Management]

9

controlled the details of [Stevenson's] work and thus, that [Stevenson] was its employee." 400 S.W.3d at 923.

## B. The Effect of the Master Agreement

There remains the question of the Master Agreement. Without it, this case is indistinguishable from *City of Bellaire*, 400 S.W.3d 922. With it, Stevenson contends that Waste Management has contracted away its exclusive-remedy protections—or at least created a fact issue as to Stevenson's employment status, as the court of appeals concluded. For the following reasons, we disagree.

The Agreement was between Taylor Smith and Waste Management National Services, an affiliate of Waste Management Texas. It states:

> **[Taylor Smith] Responsibilities:** [Taylor Smith] is in the business of supplying trained and qualified temporary labor ("Personnel") to perform work as requested by [Waste Management National Services]. [Taylor Smith] is solely responsible for performing all hiring, firing, discipline, training and other responsibilities necessary to discharge its legal obligations as the employer of the Personnel suppled to [Waste Management National Services]. [Taylor Smith] and **Personnel shall be independent contractors in respect of [Waste Management National Services] and shall not be employees of [Waste Management National Services]**. Furthermore, [Taylor Smith] and Personnel understand that they have no authority to make or imply any commitments which are binding upon [Waste Management National Services]. [Taylor Smith] is solely responsible for all payments whatsoever required to be made to or in respect of its Personnel, including, without limitation, all wages, salaries and benefits (including health insurance and/or medical payments), all federal, state and local payroll taxes, and all Workers' Compensation insurance coverage and payments. Upon demand, [Taylor Smith] shall provide [Waste Management National Services] with proof that such payments have been made. For any lawful reason (including, without limitation, an adverse result on drug and background screening) and without disclosing such reason to [Taylor Smith], [Waste Management National Services] may request that [Taylor Smith] terminate Personnel's engagement at [Waste Management National Services] immediately. [Waste Management National

Services] shall reimburse [Taylor Smith] for services performed and expenses incurred in accordance herewith up to the date of such termination notice.

(Emphasis added).

Stevenson argues that because Waste Management agreed by contract that workers supplied by Taylor Smith would be independent contractors, Waste Management cannot now contend that Stevenson is a Waste Management employee. This argument has rhetorical power, to be sure. There is a "have your cake and eat it too" flavor to Waste Management's position. It wants Stevenson to be its employee in this case, but if Stevenson had injured a third party while on the job, Waste Management would likely try to use the Master Agreement to defeat vicarious liability by arguing that Stevenson was an independent contractor. Stevenson is undoubtedly correct that Waste Management is not entitled to unilaterally switch his status between employee and independent contractor whenever one label or the other suits Waste Management. But that is not what is happening here. Instead, in the dual-employment context, this Court has previously observed that determining employment status for workers compensation purposes is not always the same thing as determining employment status for vicarious liability:

> In this case, we are construing only the Labor Code, specifically the Workers' Compensation Act; we are not applying general common-law principles regarding vicarious liability for injuries to third parties. We reiterate what we said in *Wingfoot*: "The common-law principles that define when there will be vicarious liability are designed to assign liability for injury to third parties to the party who was directing the details of the negligent actor's conduct when that negligence occurred." The Workers' Compensation Act was not.

*Garza*, 161 S.W.3d at 481 (quoting *Wingfoot*, 111 S.W.3d at 146).[4]

---

[4] The concurrence sees no difference between determining employment status under the common law and doing so under the Workers' Compensation Act. It is no doubt true in many cases that the two inquiries will look

11

Stevenson asks us to rely on *Newspapers, Inc. v. Love*, 380 S.W.2d 582 (Tex. 1964), which holds that a contract stating a person is an independent contractor is given effect unless (1) it was a subterfuge, (2) it was modified by later agreement, or (3) the exercise of control was "so pronounced" and "so persistent" as to raise an inference that the parties acquiesced in the principal's right to control the details of the work. *Id.* at 590–92. The court of appeals relied on *Love*. *Stevenson*, 572 S.W.3d at 711. *Love*, however, acknowledges that contractual independent-contractor labels are not controlling if "[t]he assumption of an exercise of control [is] so persistent and the acquiescence therein so pronounced as to raise an inference that at the time of the act or omission giving rise to liability, the parties by implied consent and acquiescence had agreed that the principal might have the right to control the details of the work." 380 S.W.2d at 592. The facts of Waste Management's daily control over Stevenson's garbage-collection work are indeed "so pronounced" and "so persistent" as to satisfy the standard articulated in *Love* for looking beyond contractual labels.

identical, and the concurrence's position is supported by statements from this Court prior to *Wingfoot* and *Garza*. But we find the concurrence's position impossible to square with *Wingfoot*'s clear holding, reiterated in *Garza*, that the two inquiries serve different purposes and can diverge to some extent in the dual-employment context. *Wingfoot* settled the question of whether an employee can have two employers under the Workers' Compensation Act, and it did so with reference to the Act's definitions of "employee" and "employer." 111 S.W.3d at 137–40. It did not do so under the common law of employment and did not resolve the dual-employment question for vicarious liability purposes. The contours of dual employment under the common law remain a separate question, one which has often been disputed both before and after *Wingfoot*. *See In re Merrill Lynch Tr. Co. FSB*, 235 S.W.3d 185, 199 (Tex. 2007) (Hecht, J., concurring and dissenting) ("Whether one can serve two masters, the law allows it and generally makes both employers liable for the agent's actions" (footnote omitted)) (citing RESTATEMENT (SECOND) OF AGENCY § 226 (1958)); *see also White v. Liberty Eylau Sch. Dist.*, 880 S.W.2d 156, 159–60 (Tex. App.—Texarkana 1994, writ denied) (holding that plaintiff could seek damages against two employers for negligence of employee); *Gulf Oil Corp. v. Williams*, 642 S.W.2d 270, 272 (Tex. App.—Texarkana 1982, no writ) (same). *But see Coronado v. Schoenmann Produce Co.*, 99 S.W.3d 741, 752 (Tex. App.—Houston [14th Dist.] 2003, no writ) ("The Coronados do not cite, and we have not found, a case in which a Texas court has applied section 226 and the joint employer doctrine when a purported employee pursues a common-law negligence claim against two or more non-subscribers. We decline to do so now because application of the joint employer doctrine in such cases is inequitable and problematic.").

There are yet other reasons for looking beyond the contractual label here. To begin with, all our previous cases in the dual-employment context have looked solely to the parties' daily relationship on the job—to whether the plaintiff was "in the service of" the defendant, as the Act puts it—not to contractual arrangements between the staffing agency and the client company. *See* TEX. LAB. CODE § 401.012(a). In *Garza*, we relied on the Workers' Compensation Act's definition of "employee," which includes "each person in the service of another under a contract of hire, whether express or implied, or oral or written." 161 S.W.3d at 476–77 (quoting TEX. LAB. CODE § 401.012(a)). We interpreted the definition to require "consider[ation of] traditional indicia, such as the exercise of actual control over the details of the work that gave rise to the injury." *Id*. We also noted that, in the dual-employment context, construing the Act's definitions is not always the same enterprise as determining employment under the common law. *Id*. at 481.

Similarly in *Wingfoot*, we grounded our employment analysis in the text of the Act and noted the potential distinction between applying the Act's definitions and determining employment under the common law. *Wingfoot*, 111 S.W.3d at 146 (distinguishing between "common-law principles" and "whether a general employer remains an 'employer' for workers' compensation purposes"). We also acknowledged that the dual-employment context, involving staffing agencies who provide workers to client companies who direct them on the job, adds complexity to the application of traditional legal standards governing employment status. *Id.* at 145–46.

Here, there can be no doubt that Stevenson was "in the service of" Waste Management when this accident occurred. *See* TEX. LAB. CODE § 401.012(a). Under any application of "traditional indicia, such as the exercise of actual control," he was Waste Management's employee

under the Workers' Compensation Act. *Garza*, 161 S.W.3d at 477. The only question is whether the labels used in the Master Agreement authorize a factfinder to ignore the facts on the ground and treat Stevenson as an independent contractor despite the lack of any factual indication that Waste Management ever relinquished the right to control its garbage-collection workers. They do not.

We addressed the effect of a contract on employer status under the Workers' Compensation Act in *Exxon Corp. v. Perez*, 842 S.W.2d 629 (Tex. 1992) (per curiam), a borrowed-servant case. We stated: "A contract between two employers providing that one shall have the right of control . . . is a factor to be considered, but it is not controlling." *Id.* at 630. Thus, even a contract speaking directly to the controlling factor—the right of control—did not dictate whether the plaintiff was the defendant's borrowed servant covered by the defendant's workers compensation policy. Instead, "[b]ecause the record . . . is replete with evidence of Exxon's right of control over Perez, the court of appeals erred by concluding that the contract between the parties was conclusive." *Id.* (footnote omitted). Under *Perez*, a contract between two companies purporting to dictate the nature of a worker's employment relationship with the companies is merely "a factor to be considered" if the right of control is "a controverted issue." *Id.*

As explained above, control is not in any real sense controverted here. Waste Management exclusively controlled Stevenson's work, both in general and when the accident occurred. And even if the Master Agreement's independent-contractor label were "considered" as a "factor," its bare existence does not create a genuine fact issue as to whether Waste Management actually had the right to control Stevenson. There is simply no evidence—whether in the contract or in the

14

parties' behavior—indicating that the Master Agreement's independent-contractor label ever had any bearing on Waste Management's right to control the workers on its garbage-collection routes.

The concurrence takes issue with our treatment of the Master Agreement. Yet the disagreement may not be as deep as it appears. The concurrence champions the freedom of contract, a position with which we agree entirely. However, the concurrence acknowledges—as it must under *Perez*—that a contractual label is not conclusive when determining workers compensation coverage in these circumstances. The concurrence would hold that the contractual label creates a fact issue regardless of the facts on the ground, while we conclude that no fact issue is raised when the only evidence cutting against Waste Management's right to control Stevenson on his garbage-collection route is a bare contractual label. The dispute is no deeper than that.

Despite the Master Agreement's "independent-contractor" label, the Workers' Compensation Act and our prior cases in the dual-employment context counsel that we examine the parties' behavior at the jobsite, perhaps more so than would the concurrence. All agree, however, that the touchstone is Waste Management's "right to control" Stevenson. In the end, the only question is whether a genuine fact issue arises as to Waste Management's right to control its garbage-collection workers merely because its contract with a staffing agency labels them independent contractors. We conclude no such fact issue exists on this record. Nothing in the parties' behavior indicates Waste Management did not have the right to control the workers on its garbage-collection routes, and nothing in the Master Agreement indicates the parties intended their use of the independent-contractor label to withdraw from Waste Management the right to control its garbage-collection workers.

15

Perhaps if daily control of Stevenson's work were split between Waste Management and Taylor Smith—or if there were evidence that Stevenson somehow controlled his own garbage-collection work—the Master Agreement's language about who employed the worker and who did not would come into play as a "factor to be considered" in determining which party had the right to control Stevenson. But a contract between a staffing agency and its client labeling temporary workers "independent contractors" of the client cannot defeat employee status where the evidence of the actual events surrounding the work conclusively establishes that the client had the right to control the temporary worker, who was therefore "in the service of" the client for purposes of the Workers' Compensation Act.[5]

This approach, which considers the factual, on-the-ground realities of whether the client company directed the activities of the staffing agency's employee—without deferring automatically to the terms of a written contract between the companies purporting to dictate employment status—flows from the language of the Workers' Compensation Act. The Act provides "express definitions of 'employer' and 'employee' that should be given effect when applicable, even if that results in an employee's having more than one employer for purposes of workers' compensation." *Wingfoot*, 111 S.W.3d at 145. The Act's definitions encompass workers

---

[5] The Fifth Circuit adopted similar reasoning in deciding borrowed-servant status under the Longshore and Harbor Workers' Compensation Act. "We recognize and reiterate that the terms of a contract and the related factual issues do not automatically prevent summary judgment or direct verdict. If the remaining borrowed employee factors overwhelmingly point to borrowed employee status, a summary judgment or direct verdict is appropriate." *Brown v. Union Oil Co. of Cal.*, 984 F.2d 674, 678 n.5 (5th Cir. 1993) (per curiam). "The Fifth Circuit has repeatedly found borrowed employee status to exist as a matter of law even when the contract between the employers provides that the worker is to be classified as an independent contractor or that the worker is not considered an employee of the borrowing entity." *Lomeli v. Sw. Shipyard, L.P.*, 363 S.W.3d 681, 689 (Tex. App.—Houston [1st Dist.] 2011, no pet.). As with Texas workers compensation law, the factor of "control over the employee and the work he is performing" is "the central factor" in the Fifth Circuit's borrowed-employee determination. *Brown*, 984 F.2d at 676.

operating under a written contract, so long as they are "in the service of" the employer. And as this Court's precedent in the dual-employment context indicates, whether a worker was "in the service of" the client company depends not exclusively on contractual labels but rather on the extent to which the defendant exercised the right to control the plaintiff's daily work.

We are mindful, as well, that workers compensation coverage is a two-way street. It "benefit[s] both employees and employers." *Port Elevator–Brownsville, L.L.C. v. Casados*, 358 S.W.3d 238, 241 (Tex. 2012). Employers who cover their employees benefit from the exclusive-remedy protection asserted by Waste Management in this case. On the other hand, workers who qualify as employees receive compensation for injuries "without regard to fault or negligence." TEX. LAB. CODE § 406.031. The Workers' Compensation Act "provide[s] employees with certainty that their medical bills and lost wages will be covered if they are injured. An employee benefits from workers' compensation insurance because it saves the time and litigation expense inherent in proving fault in a common law tort claim." *HCBeck, Ltd. v. Rice*, 284 S.W.3d 349, 350 (Tex. 2009). Not all injured workers wish to sue their employers, and the Act ensures they are compensated without having to demonstrate an entitlement to recover in court.

We historically have "construe[d] the TWCA liberally in favor of coverage as a means of affording employees the protections the Legislature created." *Casados*, 358 S.W.3d at 241. "If there be any reasonable doubt which may arise in a particular case as to the right of the injured employee to compensation [under the Act], it should be resolved in favor of such right." *Navarette*

17

*v. Temple Indep. Sch. Dist.*, 706 S.W.2d 308, 310 (Tex. 1986).[6] Declining to automatically defer to contractual agreements between two potential employers ensures these rights cannot be denied to workers by contracts over which they have no control. Although this longstanding preference for finding workers compensation coverage developed to ensure employees receive compensation, it applies with equal force when, as here, the effect of finding coverage is to protect the employer from lawsuits.

While in this case Stevenson does not want the Act to apply to him, many other temporary workers may want the certainty and prompt payment of benefits the Act provides without the need for litigation. If Stevenson were correct that a contract between his direct employer and its client can dictate whether he is entitled to workers compensation through the client, he might benefit in that he could proceed with his lawsuit against Waste Management. Other workers in similar circumstances could be harmed, however, by a rule that allowed two companies to execute a contract—over which the worker has no influence—dictating whether the worker is covered by either company's workers compensation coverage. Stevenson had the benefit of seeking workers compensation benefits from Taylor Smith and then taking his chances in a lawsuit against Waste Management. But in other cases, if the temporary agency does not have coverage or is insolvent and the agency and client have agreed that assigned workers are independent contractors, giving

---

[6] The concurrence's view that the employment inquiry is always the same no matter the context cannot be squared with the precedent's clear preference for finding employment in workers compensation cases "[i]f there be any reasonable doubt which may arise in a particular case." *Navarette*, 706 S.W.2d at 310. No such preference exists outside the workers compensation context.

18

effect to the agreement between the employers could deprive the worker of all benefits under the Act.

A related reason the Master Agreement does not dictate the outcome is that Stevenson was not a party to it.[7] The Agreement states that both Taylor Smith and its personnel shall be independent contractors, but there is no indication that Stevenson ever saw the Master Agreement or agreed to be bound by it. If two employers could bargain away their employees' rights in this way without an examination of how the employment operated in practice, workers provided by staffing agencies could be cut out of the Act's protections altogether, even if the client company provided coverage for its other workers.

We agree with the concurrence, of course, that "Texas strongly favors parties' freedom of contract," under which parties may "bargain for mutually agreeable terms and allocate risks as they see fit." *Gym-N-I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 912 (Tex. 2007). "Texas courts regularly . . . reject legal claims that are artfully pleaded to skirt unambiguous contract language, especially when that language is the result of arm's length negotiations between sophisticated business entities." *Energy Transfer Partners, L.P. v. Enter. Prods. Partners, L.P.*, 593 S.W.3d 732, 738 (Tex. 2020). But "[c]ontracts bind parties, not nonparties." *NRG Power*

---

[7] As noted, Waste Management was not a party to the Agreement either. Its affiliate, Waste Management National Services, was the party to the Agreement. "[A] contract with one corporation . . . is generally not a contract with any other corporate affiliates." *In re Merrill Lynch Tr. Co. FSB*, 235 S.W.3d 185, 191 (Tex. 2007); *see also* TEX. BUS. ORGS. CODE § 21.223 (providing that affiliates are not liable for contractual and other obligations of a corporation absent actual fraud). However, the Agreement states that affiliates such as Waste Management Texas "are intended third party beneficiaries of this Agreement" and that references in the Agreement "shall be deemed to include Affiliates as the context requires." We do not resolve the parties' dispute about the Master Agreement's applicability to Waste Management Texas. Even if Stevenson is correct that the Master Agreement binds Waste Management Texas, the contractual designation of Stevenson as an independent contractor does not affect the outcome in the face of the overwhelming evidence of Waste Management's right to control Stevenson's work.

*Mktg., LLC v. Me. Pub. Utils. Comm'n*, 558 U.S. 165, 175 n.4 (2010). In this dual-employment context, there are three concerned parties, not just the two who executed the Master Agreement. Determining a worker's employment status in this context is not always as simple as consulting a contract between his two potential employers.

### III. Conclusion

There is no genuine issue of material fact as to whether Waste Management had "the right to control the progress, details, and methods of operations of [Stevenson's] work." *Limestone Prods.,* 71 S.W.3d at 312. Even if the Master Agreement is a "factor to be considered," it does not create a fact issue sufficient to avoid summary judgment given the conclusive nature of the countervailing facts. Summary judgment for Waste Management was appropriate, and the court of appeals erred by concluding otherwise. We reverse the court of appeals' judgment and render a take-nothing judgment against Stevenson.

_____
James D. Blacklock
Justice

**OPINION DELIVERED:** April 30, 2021